UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | Criminal Action No. 5: 17-134-DCR |
| V. | ) ) | |
| LOUIS L. MARTIN, | ) ) ) | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

Defendant Louis Martin has moved to suppress all evidence recovered by law enforcement during a warrantless search of his apartment on June 12, 2017. [Record No. 12] A hearing was held on the motion on February 21, 2018. [*See* Record Nos. 20-22] The motion will be denied for the reasons that follow.

**I.**

The Lexington Police Department received a 911 call on June 12, 2017, stating that a woman was being held against her will with a gun to her head. Officers Lusardi and Patterson were dispatched to meet with the complainant, Tia Payne, at a Speedway gas station and convenience store at the corner of Liberty and New Circle Roads. The officers arrived at approximately 7:25 p.m., and Payne arrived shortly thereafter. The officers testified, and video evidence confirms, that Payne was "clearly distraught." Payne advised officers that her friend, Sarah Williams, was being held against her will by Defendant Louis Martin at 1749 Liberty Road, Apartment 45. Payne indicated several times that Martin had assaulted Williams, who was pregnant, that there was "blood everywhere," and that Ms. Williams had broken bones,

- 1 -

blood running down her face, and was sitting in the back bedroom of the apartment on a "narcotic high."

Payne was concerned about Williams' safety and repeatedly asked the officers for help. However, she continued to warn that if the officers were not cautious, Martin could pose an additional risk of danger to them and Williams. Payne told the officers that Martin "did 18 years for murder and got convicted." She stated that she was only allowed to leave the apartment to get food and that if she did not return soon, or if Martin saw the officers approaching, he would shoot the officers and/or Williams.

The officers found Payne to be credible. Although Payne was clearly distraught and upset, she did not appear to be intoxicated, and the officers believed, based on their observations and training, that she had a legitimate, true fear for her friend's safety. Officer Patterson confirmed that Martin lived at the address that Payne provided, and that Martin had previous charges for violent crimes. The officers also found that that Martin had been arrested a few months earlier for assault based on allegations that he hit another person in the head with the butt of a gun and had held that person against her will. Officer Bereznak, who later responded to the scene, stated that this bolstered the credibility of Payne's story, since it appeared to indicate a pattern of behavior or *modus operandi*.

Officers Lusardi and Patterson met with Officers Bereznak, Burch, Yoder, and Lieutenant Brotherton at the apartment complex. Payne also came to the apartment complex, and consistently repeated the same version of events she had related in her 911 call and in her conversation with Officers Lusardi and Patterson. Officer Bereznak and Lieutenant Brotherton did not observe any signs that Payne was intoxicated. Instead, Officer Bereznak stated that he found the threat to be very real and very credible.

Lieutenant Brotherton, the senior supervisor on the scene, decided that it was necessary to make a relatively immediate tactical entry into the apartment to protect the safety of the victim inside as well as others living in the area. He determined that there was not enough time to call in a rapid response (or SWAT) team to carry out the entry, which likely would have taken in excess of thirty to forty-five minutes, or to seek a warrant, which could have taken considerably longer. As a result, he arranged for the officers to make a tactical entry into the apartment designed to avoid a shootout or hostage situation. The plan was for Payne to enter the apartment first with a brown paper bag that appeared to contain food, and a cell phone that allowed her to stay in contact with police. Then, after confirming that Martin and Williams were still inside the apartment and the situation was ongoing, Payne was to unlock the door to the apartment so that the officers could make entry without the use of force.

Payne unlocked the door and the officers executed the tactical entry without discharging their weapons. They found Martin seated on the couch with a loaded gun in plain view. Williams was in the back bedroom as Payne had predicted. Although Williams was "very uncooperative in relaying any information" when questioned by officers, the officers observed an open wound on her forehead which was severely swollen. It appeared as though the wound was the result of being struck with the handgun. Her face was already bruising around one eye and swelling likely from broken facial bones. Officer Bereznak and Lieutenant Brotherton testified that they observed blood on the walls in the hallway and bedroom. Additionally, officers discovered a bloody rag and an area on the bed that was soaked with blood.

Martin was immediately arrested, the firearm was seized, and Williams was taken away to receive medical treatment. A forensics unit then arrived and officers re-entered the apartment and "took photos for evidence." [Record No. 12-2]

Martin argues that the warrantless entry into his apartment was an unconstitutional search in violation of the Fourth Amendment, and was not justified by exigent circumstances. [Record Nos. 12, 22] The United States responds that the officers were justified in entering the apartment because they reasonably believed that a person inside had been seriously injured or threatened with such injury and was in need of immediate aid.[1] [Record No. 20] After considering all evidence submitted, the Court concludes that Martin is clearly wrong in his assertions. Exigent circumstances justify the actions of the Lexington police department

---

[1] Martin also contends that any exigency that may have justified the officer's initial entry subsided prior to the officers' re-entry to photograph the crime scene, and this evidence should be suppressed. [Record No. 22, pp. 4-6] However, the United States has indicated that it does not plan to introduce any evidence obtained after the officers re-entered the apartment in its case-in-chief, and there is no dispute that the evidence relating to the officer's initial entry into the apartment and seizure of the firearm was obtained before the alleged exigency had subsided. Accordingly, suppression of this later-acquired evidence appears to be a moot issue *unless Payne or Williams testify contrary to the story provided to officers prior to their entry into the apartment. If that occurs, this evidence may be admissible for impeachment purposes.*

The Court notes that "an initial emergency will not justify (1) a search that is conducted after the exigency has subsided, or (2) a search of an area that is more intrusive than is necessary to address the immediate danger." *United States v. Fisher*, 145 F. Supp. 2d 853, 860-61 (E.D. Mich. 2001). For example, the Sixth Circuit has held that officers who were justified in initially entering an apartment to free a victim being held in apartment against her will were not justified in subsequently searching a closet and seizing guns from it after the victim was freed and the exigency had ended. *Johnson*, 22 F.3d at 680. However, to the extent that the officers already had knowledge of the facts observed on re-entry, and did not conduct a new or more intrusive search as in *Johnson*, the initial entry would provide an independent lawful source for the evidence, and it would be admissible under the independent source doctrine. *See Murray v. United States*, 487 U.S. 533, 537 (1988).

whose officers performed admirably in responding to – and defusing – a very dangerous situation.

## II.

"A police officer's entry into a home without a warrant is presumptively unconstitutional under the Fourth Amendment. Warrantless entries are permitted, however, where 'exigent circumstances' exist." *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002). "One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (citing *Mincey v. Arizona*, 437 U.S. 385, 392 (1978)). To satisfy the exigent circumstances exception, the government "must show that there was a risk of serious injury posed to the officers or others that required swift action." *United States v. Huffman*, 461 F.3d 777, 783 (6th Cir. 2006). "This 'emergency aid exception' does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises. It requires only 'an objectively reasonable basis for believing,' that 'a person within the house is in need of immediate aid.'" *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (quoting *Brigham* City, 547 U.S. at 404-06 and *Mincey*, 437 U.S. at 392).

In reviewing whether exigent circumstances were present, the Court considers the "totality of the circumstances and the inherent necessities of the situation at the time." *Huffman*, 461 F.3d at 783. (quoting *United States v. Rohrig*, 98 F.3d 1506, 1511 (6th Cir. 1996)). "Indications of the need of aid include reported observations of distress, *Schreiber v. Moe*, 596 F.3d 323, 330 (6th Cir. 2010), and credible, reliable evidence that someone inside

the home is in trouble. *Johnson v. City of Memphis*, 617 F.3d 864, 869 (6th Cir. 2010)." *United States v. Barclay*, 578 F. App'x 545, 548 (6th Cir. 2014).[2]

Payne had recently been in the apartment and told the officers that Williams was being held against her will with a gun to her head, and that "there was 'blood everywhere,' and that Ms. Williams had broken bones, [and] blood running down her face." [Record No. 12-2] Payne consistently reported the same version of events to multiple officers, and appeared to have a legitimate fear for her friend. All of the officers present found her to be credible. The

---

[2] The defendant contends that the phrase "an objectively reasonable basis" means "probable cause." [Record No. 12, p. 3; Record No. 22, pp. 1-2] The relationship between the reasonable basis and probable cause standards is unclear. *Compare United States v. Infante*, 701 F.3d 386, 392–93 (1st Cir. 2012) (reasonable-basis standard "approximat[es] probable cause"), *with United States v. Porter*, 594 F.3d 1251, 1258 (10th Cir. 2010) (reasonable-belief standard "is more lenient than the probable cause standard"). The Sixth Circuit has not addressed this issue, and it is not necessary to decide it here. Instead, the Court will simply apply the standard used by the Sixth Circuit in the emergency aid context.

But the officers did have probable cause in this case. The defendant argues to the contrary, citing cases which involved anonymous informants and accordingly required corroboration. *See Illinois v. Gates*, 462 U.S. 213, 241 (1983); *United States v. Higgins*, 557 F.3d 381, 400 (6th Cir. 2009). However, these cases are a poor guide in this case. In emergency situations (and unlike cases involving a confidential informant) the person providing information to the police most often does not have prior contact with law enforcement (or with the law enforcement officers who must respond quickly), and so cases assessing a confidential informant's reliability are of little relevance. Instead, the Court must take a totality-of-the-circumstances approach to determining whether sufficient cause exists for the entry. *Gates*, 462 U.S. at 230. An informant's veracity and basis of knowledge are relevant considerations in this inquiry, but both are not required, and "a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Id.* at 233. In this case, Payne's strong basis of knowledge (personal observation), consistent story, and credible appearance are sufficient to support a finding of probable cause even without further "indicia of reliability." *See United States v. Kinson*, 710 F.3d 678, 682 (6th Cir. 2013) ("[W]e have clearly held that a known informant's statement can support probable cause even though the affidavit fails to provide any additional basis for the known informant's credibility and the informant has never provided information to the police in the past." (citing *United States v. Miller*, 314 F.3d 265, 270 (6th Cir. 2002))).

officers confirmed that Martin lived at the address Payne provided, and that he had a previous charge for murder, as Payne had stated. Additionally, the officers found that Martin had recently been arrested for allegedly hitting a victim with a gun, which was similar to the events that Payne described. Payne confirmed that Williams and Martin were still in the apartment before the officers entered, and upon entry the officers found Williams in the back bedroom where Payne said she would be, and Martin with a loaded gun in plain view at his feet. Williams had injuries consistent with being hit with the butt of a gun, and there was blood on the walls and bed.[3]

Martin argues that the officer's entry was not justified because the officers did not observe corroborative evidence of violence at the apartment before entering, relying heavily on *United States v. Dawson*, 2013 WL 1332573 (E.D. Ky. Mar. 15, 2013). In *Dawson*, an assault victim was taken to a hospital after two to three subjects broke in his back door wearing ski masks during the night while he was sleeping and assaulted him, tied him up, and burned his legs with a hot iron. *Id.* at *2. The woman who drove Dawson to the hospital left when the police were called, and Dawson appeared to be "avoiding disclosure" and "was not very forthcoming." *Id.* at *2. However, he indicated that "a female and child were at the invasion site during the violent night." *Id.* at *3. The officers were unsure whether the address Dawson provided actually represented the assault site until they observed that the back door was ajar and surrounded with shattered glass, which was consistent with Dawson's story of a forced entry through the rear door. *Id.* at *4. Although they did not know whether anyone was in the

---

[3] The Court does not rely on facts observed by officers after entry to support the decision to enter.

home or how long had elapsed since the assault, they entered the home pursuant to the emergency aid exception. *Id.* at *4, 8-9.

Magistrate Judge Wier found that the emergency aid exception was satisfied. He analogized the case to *Huffman*, where officers responded to a 911 call reporting shots fired at a neighboring residence. *Huffman*, 461 F.3d at 780. The police did not know whether anyone was in the home and no one answered the front door. *Id.* However, the police noted "bullet holes in the front windows of the house, and they stepped over shards of glass on the front porch." *Id.* at 780. They saw furniture "suggesting that the house was occupied," and decided to enter the home, without a warrant, through a partially-opened window "to be sure that there was no one injured on the inside." *Id.* at 784. The Sixth Circuit held that, although the police did not know whether anyone in the home or had been in the home at the time of the shooting, and in previous cases "the officers had more definitive information that either someone was in possible danger or that someone posed a risk to the officers," the totality of the circumstances supported a finding that the officers' warrantless entry was justified. *Id.* at 785. Magistrate Judge Wier reasoned that similarly, the corroborative evidence found at Dawson's home provided the police with sufficient justification to enter the home—despite the lack of "more definitive information" that someone was in possible danger. *Dawson*, 2013 WL 1332573 at *8-9.

In *Dawson* and *Huffman*, it was important that the officers observed circumstantial evidence before entering because they lacked "more definitive information" that someone inside was in possible danger. By contrast, in the present case, police conducted an in-person interview with a credible eyewitness who had recently been in the apartment and stated that someone inside the apartment had been injured, was under a continuing threat of violence, and

- 8 -

needed immediate assistance. Payne confirmed that Martin and Williams were still in the apartment and that the situation was still ongoing before unlocking the door for the police to enter. Payne's reports, coupled with the officer's confirmation of Martin's name, address, and criminal history, provided the officers with an objectively reasonable basis for believing that a person within the house was in need of immediate aid. *Fisher*, 558 U.S. at 47. No further corroboration was needed.

Courts have found that the emergency aid exception was not satisfied when the police responded to investigate a possible burglary rather than an emergency aid situation, or entered a residence based solely on an anonymous 911 call. *Johnson*, 617 F.3d at 870. Here, the police did neither. They responded to an emergency aid situation, and entered the apartment based on statements made by an eyewitness that they met in person and determined to be credible, and who provided a consistent story and correctly stated the defendant's name and criminal history. The officers found the firearm in plain view near Martin's feet immediately upon entry, and had the right to seize objects of apparent evidentiary value which were in plain view. *Tyler*, 436 U.S. at 509-10; *Mincey*, 437 U.S. at 393.

### III.

For the foregoing reasons, the officer's warrantless entry into the defendant's apartment was justified by exigent circumstances. In short, an emergency situation was presented, at least one person was in danger of being killed or further injured by the defendant, and swift action was required. Accordingly, it is hereby

**ORDERED** that the defendant's motion to suppress [Record No. 12] is **DENIED**.

This 22nd day of February, 2018.



Signed By:
*Danny C. Reeves* DCR
United States District Judge